Argued August 25, 1978, reversed February 6, petition for review
denied March 13, petition for review allowed June 26, 1979

# CLARK, *Respondent,*

### *v.*

# U. S. PLYWOOD, *Petitioner.*

## (No. 76-6736, CA 10832)

590 P2d 281

Keith D. Skelton, Portland, argued the cause and filed the brief for petitioner.

Benton Flaxel, North Bend, argued the cause for respondent. With him on the brief was Flaxel, Todd & Nylander, North Bend.

Before Richardson, Presiding Judge, and Lee and Joseph, Judges.

JOSEPH, J.

**JOSEPH, J.**

This case involves the scope of the personal comfort doctrine. The sole issue in this workers' compensation case is whether the employee's death arose out of and in the course of his employment, as required by ORS 656.005(8)(a). The referee ruled that it did not. The Workers' Compensation Board (Board) disagreed and granted benefits to the employee's beneficiaries.

The deceased employee (Clark) worked in a plywood manufacturing plant on the 11 p.m. to 7 a.m. shift. During the shift he was allowed a 20-minute meal period, for which he was paid. The employer provided a lunchroom, but employees were not required to eat there. The lunchroom was equipped with tables and vending machines, but there were no facilities for heating food which might be brought in by workers.

On the night of the fatal accident, Clark brought food which required heating. As meal time approached, he placed his food in a metal pan and took it to a hot glue press located about 100 feet from his work station.[1] He asked the assistant press operator, who had heated food for him before, where there was a good place to warm his lunch. The assistant operator, who was then eating, indicated a ledge on top of the hot press. Clark asked him to place the pan there, but he refused, saying Clark should put it there himself. He

---

[1] The machine consists of two large units, the press and the carriage, each about 20 feet high and 15 feet square. When the units are separated, there is a gap approximately three feet wide between them. Chains on each end of the gap prevent one from entering the gap while the machine is in operation. The chains are connected to a fail-safe device; when either of the chains is unhooked, the machine is inoperable. The press is capable of bonding about 25 sheets of plywood at a time, the sheets lying parallel to the floor. The carriage is mounted on tracks which connect it to the press. The major component of the carriage is the charger. It mechanically feeds the press with the wood to be bonded into sheets and is loaded by the operator and his assistant. It is activated by a switch on the operator's control panel. When activated, the carriage moves along the tracks to the press, closing the gap. The charger nests with the shelves of the press. The wood is pushed from the charger into the press by a device which sweeps from the back of the charger to the end nested with the press. Part of that feeding device is a beam which sweeps across the top of the charger. It was that beam which crushed the worker.

cautioned Clark to disconnect the safety chain, which would render the machine inoperable, before stepping between the two large sections of the machine (that is, between the press and the carriage). Clark disconnected the chain, stepped between the press and carriage and climbed up the face of the press. He put his lunch on top on the end furthest away and hidden from view from the operator's control panel, climbed down and returned to his work.

Several minutes later Clark returned. The assistant operator saw him standing on the bottom step of a maintenance ladder which led to the top of the carriage on the side opposite the controls. The charger had just been loaded and was about to be activated to load the press. Clark said something about getting his lunch and started up the ladder. The assistant operator walked around to the end of the press, from which point Clark was not in view. The operator, who had last seen Clark standing several feet from the ladder and who did not understand what Clark had said about getting his lunch, activated the charger. Clark, who had by then climbed onto the top of the carriage, was crushed between a moving beam and a stationary beam.

■■ Giving the workers' compensation law a liberal interpretation, we have recognized in several cases that injuries incurred in "personal comfort" activities incidental to employment may be compensable. *See Benadel v. SAIF,* 33 Or App 597, 577 P2d 99 (1978); *Olsen v. SAIF,* 29 Or App 235, 562 P2d 1234, *rev den* (1977); *Casper v. SAIF,* 13 Or App 464, 511 P2d 451 (1973); *Jordan v. Western Electric,* 1 Or App 441, 463 P2d 598 (1970). Under those cases, injuries incurred while eating or preparing food on the employer's premises could be encompassed within "personal comfort" coverage.[2]

---

[2]The problem presented in *Otto v. Moak Chevrolet, Inc.,* 36 Or App 149, 583 P2d 594 (1978) is not involved here. If Clark's conduct had been incidental to his employment, there would be no dispute that his fatal injuries "arose from" his employment.

The referee ruled that the "personal comfort" doctrine was inapplicable here because the method chosen by Clark to retreive his food was "unusual, abnormal, unreasonable and highly dangerous." In so ruling, the referee relied on Larson, Workmen's Compensation Law, 5-59—5-70, §§ 21.81-21.84 (1972). The Board determined that regardless of the unreasonableness of Clark's conduct in attempting to retrieve his lunch, his fatal injuries arose out of and in the course of his employment. In light of ORS 656.156(1) and 656.310(1)(b),[3] the Board concluded, no reasonableness limitation on the "personal comfort" doctrine can properly be adopted. It found that in failing to disconnect the safety chain before attempting to recover his lunch, Clark was merely negligent, and his beneficiaries could not be denied compensation by reason of that negligent act alone.

■ We have not previously had occasion to consider whether there is a reasonableness limitation in the personal comfort doctrine. Some courts have ruled that an employee's conduct in pursuit of personal comfort may be so unusual or unreasonable that it cannot fairly be considered incidental to his employment. *See* cases cited in Larson, *supra,* 5-51 — 5-62, §§ 21.81-21.84 (1978).

■ We do not agree with the Board's reliance on ORS 656.156(1) and 656.310(1)(b) as bases to reject the limitation. ORS 656.005(8)(a) provides that only injuries which arise out of and in the course of covered employment are compensable. The personal comfort

---

[3] ORS 656.156(1):

"If injury or death results to a worker from the deliberate intention of the worker himself to produce such injury or death, neither the worker nor the widow, widower, child or dependent of the worker shall receive any payment whatsoever under ORS 656.001 to 656.794."
ORS 656.310(1)(b):

"In any proceeding for the enforcement of a claim for compensation under ORS 656.001 to 656.794, there is a rebuttable presumption that:
"* * * * *

"(b) The injury was not occasioned by the wilful intention of the injured worker to injure or kill himself."

[ 385 ]

doctrine is applied in determining if that condition is satisfied, and until it is determined that the injury did arise out of and in the course of covered employment, the exception provided in ORS 656.156(1) is not relevant. It does not, therefore, bear on the scope of the personal comfort doctrine.[4] *See* Larson, *supra,* 5-59, 5-60, § 21.81. ORS 656.310(1)(b) does not relate to the issue here at all, there being no contention that Clark intended his own death.

■■  To deny a compensation claim arising out of conduct that was so unreasonable as to compel a conclusion that it could not have been in the course of employment is consistent with both the letter and the spirit of the workers' compensation statutes. Unreasonableness of the employee's conduct in pursuit of personal comfort must be determined in light of all the circumstances. Several factors have been recognized as having significance in that determination. For example, the employee's conduct has consistently been viewed more favorably where the employer has failed to provide necessary facilities for the satisfaction of personal needs which are bound to occur at the place of work. Larson, *supra,* 5-63, 5-64, § 21.83. Whether or not the employer has encouraged, acquiesced in or forbidden the conduct, either historically or in the particular instance, are other apt considerations.

■  In this case the employer provided no facility for heating food brought in by the workers. Management

---

[4] In applying the personal comfort doctrine some courts have attempted to distinguish between the negligent performance of a personal comfort activity and unreasonable methods of seeking personal comfort. The former is considered compensable, the latter not. *See* Larson, Workmen's Compensation Law, 5-64, 5-65, § 21.84 (1978). An example is a case in which it was held that injuries which resulted from the throwing of gasoline on an open fire by employees trying to stay warm were compensable because the "act" of building a fire for personal comfort was not an unreasonable means of seeking personal comfort and was therefore within the course of employment. The fact that the "act" was performed "negligently" did not take it out of coverage. *Bubis v. Flockhardt Foundry Co.,* 119 NJL 136, 194 A 781 (1937), aff'd 120 NJL 177, 198 A 851 (1938). We find it unnecessary and undesirable here to attempt to apply the elusive distinction between an "act" and the manner of doing the act and focus instead on analyzing the activity from which the injury resulted.

was aware that employees did bring in meals which required heating and that they were heating food in the production area by various means. Supervisors were also aware that prior to the addition of the charger to the hot glue press (about a year before the accident) employees had used the press to heat lunches. However, the evidence would not permit a conclusion that they knew that since the addition of the charger—which tremendously increased the danger of the machine—employees were using it for that purpose. There was evidence that at about the time the charger was added, a written notice prohibiting the use of the press to heat food had been posted on a bulletin board. It was unclear how long the notice remained there, but it had been removed some time before the fatal accident.

The assistant press operator testified that although the use of the press for preparing meals decreased after the charger was installed, *he* continued to place food there for fellow employees once or twice a week. In fact, he had heated food for Clark in that manner before, the last time being two weeks before the incident. There was no evidence, however, that any employee other than the press operators had previously placed food on or removed it from the top of the press (at least since the charger was added) or that the press operators or anyone else ever did so while the machine was in operation.

The press was obviously dangerous. From each of the chains which barred entry into the area between the carriage and the press hung a sign warning "DANGER-Keep out." When either of those chains was disconnected—as Clark did when he placed the food on the ledge—the machine was inoperable. When he attempted to retrieve his lunch, however, Clark did not disconnect either chain; nor did he check with the operator. No one indicated to him that the novel method he chose to retrieve his lunch, *i.e.,* climbing on *top* of the carriage while the machine was in operation,

would be safe. The assistant operator, the only one who saw Clark at the ladder, had no indication that he would do what he did.[5]

The conduct from which Clark's fatal injuries resulted was so unreasonable that it cannot fairly be considered incidental to his employment. The order of the Board awarding compensation is reversed.

Reversed.

---

[5]No claim is made that the witness should have warned Clark. Had Clark merely used the ladder to climb to a point where he could have reached the food (without climbing on top), he would not have been exposed to the extreme danger that killed him.